IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

J.P., [1]

      Plaintiff,

v.                               Civil Action No. 4:20-cv-317

UNITED STATES OF AMERICA;
OFFICER JIMMY HIGHSMITH;
WARDEN T.A. JONES;
WARDEN CRAIG COIL;
SIS OFFICER RONALD PROFFITT;
OFFICER GEOFFREY BROWN;
OFFICER MANUEL PULIDO; and
NAKAMOTO GROUP, INC.

      Defendants.

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff, J.P, by and through her attorneys, brings claims based upon the Eighth Amendment to the United States Constitution pursuant to the legal standards set forth in *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics,* 403 U.S. 388, 91 S. Ct. 1999, 29 L. Ed. 2d 619 (1971), and based upon the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2671, *et seq.* and/or other applicable law.

1.      J.P., while an inmate in the custody of the Federal Bureau of Prisons ("BOP"), endured a brutal rape and sexually battery by Officer Jimmy Highsmith ("Highsmith") and sustained damages as a proximate result.

---

[1] These initials, and all initialized references to inmate victims of sexual assault at FCI Tallahassee, are pseudonyms used to protect the subject's identities for personal safety reasons. These persons have legitimate fears of retaliation from correctional officials and/or present or former inmates for making public allegations regarding correctional officers.

2.      J.P. brings this suit to recover for the violation of her constitutional rights and for the negligent acts of the BOP employees named herein, who failed in their duty to protect her from the known risk that Highsmith posed to her and to all inmates confined at FCI Tallahassee.

3.      Defendant correctional employees working at FCI Tallahassee knew that Highsmith, as an individual, posed a threat to the safety of J.P. and all other inmates.

4.      Defendants Warden T.A. Jones ("Warden Jones" or "Jones"), Warden Craig Coil ("Warden Coil" or "Coil"), Special Investigative Services Officer Ronald Proffitt ("SIS Proffitt" or "Proffitt"), Officer Geoffrey Brown ("Officer Brown" or "Brown") and Officer Manuel Pulido ("Officer Pulido" or "Pulido") were also aware that Highsmith posed a significant risk of sexual assault and sexual abuse to the inmate population at FCI Tallahassee, including and especially J.P.

5.      As a federal inmate, J.P. was committed to the Government's care, custody, and control and while in such custody federal law specifically requires the BOP to "provide for the safekeeping, care, and subsistence of all persons charged with or convicted of offenses against the united states" and to "provide for the protection ... Of all persons charged with or convicted of offenses against the United States." 18 U.S.C. § 4042(a)(2)-(3).

6.      As a federal inmate, J.P.'s options for escaping sexual assault or for resisting the sexually abusive conduct of a guard were limited. J.P.- like all inmates at FCI Tallahassee – relied on employees to protect her from sexual abuse by guards and staff.

7.      Pursuant to a contract between defendants U.S.A. and Nakamoto Group, Inc. Nakamoto Group, Inc. was contractually obliged to provide Prison Rape

Elimination Act (PREA) audits to assist the Bureau of Prisons in identifying and addressing the various factors that contribute to inmates' risk of being sexually abused and/or assaulted in each of the facilities it operates. Nakamoto Group, Inc., failed in its duty to plaintiff to conduct reasonable and appropriate audits under the contract, which was a proximate cause of the damages suffered by J.P.

8.      As a result of the harm sustained by her while she was an inmate at FCI Tallahassee, J.P. suffered injuries to include: physical harm sustained during a rape that required hospitalization, and emotional harm to include the dignitary injury of being forced to endure sexual activity to which she did not consent, for which she had neither the legal nor volitional capacity to consent, and from which she had no lawful means of escape.

## JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §§1331 and 1346 (b)(1) as the claims in this case are brought against the United States of America under the Federal Tort Claims Act (FTCA), 28 U.S.C.§ 2671, *et seq.,* against the individual Defendants under the Eighth Amendment to the United States Constitution, pursuant to *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics, 403 U.S. 388 (1971),* and against Nakamoto Group, Inc., under 28 U.S.C.§ 1332. The parties to this action are completely diverse as to citizenship and/or state of incorporation.

10.     Venue is appropriate in this Court pursuant to 28 U.S.C. § 1402(b), as some or all the events upon which this action is based occurred in the Northern District of Florida.

11.     Plaintiff has exhausted all administrative remedies and obtained what relief the administrative remedies could provide.

## PARTIES

## Plaintiff

12.     At all times material hereto, Plaintiff J.P. was a federal prisoner confined at FCI Tallahassee, in Tallahassee, Florida, which facility is within the Northern District of Florida.

## Defendants

13.     The United States of America is a sovereign entity named herein pursuant to the FTCA.

14.     Defendant the United States of America oversees the Federal Bureau of Prisons "Bureau" or "BOP", which is responsible for the custody and care of federal inmates.

15.     Federal Correctional Institute Tallahassee employs correctional officers, facilities staff and management to oversee and operate the prison facility. The correctional officers are trained, managed, overseen and paid by the BOP through the United States Department of Justice serving "investigative or law enforcement" functions.

16.     The conduct of Defendants Highsmith, Wardens Coil and Jones, SIS Proffitt, Officer Pulido, and Officer Brown, as complained of herein subjects the United States of America to liability for improper actions committed within the course and scope of their employment.

17.     At all times relevant to this complaint, Highsmith was employed by the BOP as a Correctional Officer at FCI Tallahassee, in which capacity he was responsible

for, among other things, maintaining security at FCI Tallahassee and for providing safekeeping, care, and protection of inmates incarcerated there, including J.P.

18.     Defendant Highsmith is a serial sexual abuser of BOP inmates. Highsmith's practice of raping inmates in FCI Tallahassee's custody has been documented, ignored and/or covered up by the BOP and by officials and guards at FCI Tallahassee since at least 2014.

19.     Highsmith was known to the FCI Tallahassee Management Team and the Prison Investigative Agencies to be a sexual predator, but he was allowed unrestricted and unsupervised access to female inmates.

20.     Highsmith engaged in the systematic sexual harassment, sexual abuse, and sexual assault of Plaintiff J.P.

21.     Warden Jones was at all times relevant to this complaint, a BOP employee and, on information and belief, a Florida resident. Defendant Jones was Warden of FCI Tallahassee in 2014, in which capacity she had full administrative responsibility for the entire institution.

22.     As Warden, Jones had overall responsibility for facility-wide adherence to policies concerning sexually abusive behavior by FCI Tallahassee guards against inmates. As Warden, Jones was responsible for compliance with BOP and PREA-mandated standards. Jones was also responsible for supervising, training, and disciplining correctional officers at FCI Tallahassee. Jones is named in both her official and individual capacities.

23.     Warden Coil was, at all times relevant to this complaint, a BOP employee and, on information and belief, a Florida resident. Defendant Coil was Warden of FCI

Tallahassee in 2018 and 2019, in which capacity he had full administrative responsibility for the entire institution.

24.     As Warden, Coil had overall responsibility for facility-wide adherence to policies concerning sexually abusive behavior by FCI Tallahassee guards against inmates. As Warden, Coil was responsible for compliance with BOP, FPC and PREA-mandated standards. Coil was also responsible for supervising, training, and disciplining correctional officers at FCI Tallahassee. Coil is named in both his official and individual capacities

25.     SIS Officer Proffitt ("Officer Proffitt" or "Proffitt") was responsible for, among other things, assisting the management team in providing safekeeping, care, and protection of inmates at FCI Tallahassee in his investigative capacity to report the information regarding the sexual misconduct of Highsmith..

26.     At all times relevant to this complaint, Correctional Officer Geoffrey Brown ("Officer Brown" or "Brown") was employed as a correctional officer at FCI Tallahassee and, on information and belief, is a Florida resident. At all times relevant to this complaint, Officer Brown was responsible for, among other things, providing safekeeping, care, and protection of inmates at FCI Tallahassee, including the Plaintiff. Officer Brown is named in his individual capacity.

27.     At all times relevant to this complaint, Correctional Officer Manuel Pulido ("Officer Pulido" or "Pulido") was employed as a correctional officer at FCI Tallahassee and, on information and belief, is a Florida resident. At all times relevant to this complaint, Officer Pulido was responsible for, among other things, providing safekeeping, care, and protection of inmates at FCI Tallahassee, including the Plaintiff. Officer Pulido is named in his individual capacity.

28.     Defendant United States of America has various agencies including but not limited to the Office of Internal Affairs ("OIA"), the Office of Inspector General ("OIG"), the U.S. Department of Justice ("DOJ") and many other special agents and supervisory attorneys who are responsible for the investigation and prosecution of correctional officers sexually abusing inmates at federal institutions including FCI Tallahassee. These agencies failed to timely investigate and prosecute any of the criminal activity perpetrated by Officer Highsmith. SIS, OIA, OIG and DOJ are collectively referred to herein as the "Prison Investigative Agencies".

29.     All defendants above were, during all conduct relevant to this complaint, acting under color of law.

30.     Defendant Nakamoto Group, Inc**.** ("Nakamoto") is a Delaware Corporation with its principal place of business in the state of Maryland.

31.     The BOP contracted with Nakamoto to carry out inspections of FCI Tallahassee in accordance with the standards mandated by PREA. Nakamoto was contractually obliged to carry out those inspections as part of the auditing process required by PREA for the benefit of all inmates in the custody of FCI Tallahassee.

32.     At all times relevant to this complaint, Nakamoto was the auditor for inspecting, monitoring and oversight of BOP compliance with PREA standards at FCI Tallahassee.

## FACTUAL BACKGROUND

J.P. re-alleges and incorporates by reference all of the preceding allegations set forth herein.

33.     Highsmith was hired by the BOP in April 2007 at FCI-Coleman, and later transferred to FCI-Tallahassee in May 2010.

34.     Highsmith attended and completed the BOP's Correctional Training Program, Phases I (an introductory two-week course) and II (a three-week long course) and also received a week of specific training on how to supervise female offenders.

35.     On information and belief, Highsmith has received annual refresher training every year forward beginning in 2008 which includes continuing education on the prohibition of sexual abuse of inmates.

36.     BOP policies are contained in documents titled "program statements" which set forth rules and procedures that all BOP employees are required to follow.

37.     Program Statement 3420.11 sets out the duties and responsibilities of all BOP employees. It requires that employees, "[A]s soon as practicable (but no later than 24 hours) report to their CEO (or other appropriate authority such as the Office of Internal Affairs or the Office of the Inspector General) any violation, appearance of a violation, or attempted violation of these Standards or of any law, rule, or regulation. Every employee is required to immediately report to management any act or omission by any person that could result in a breach of institution security. Failure by employees to follow these regulations and policy or any other Bureau policy or relevant regulation(s) could result in disciplinary action, up to and including removal."

38.     Program Statement 3420.11 (Standards of Employee Conduct) mandates that "[n]o employee shall engage in, or allow another person to engage in, sexual behavior with an inmate. There is never any such thing as *consensual* sex between staff and inmates."

39.     Program Statement 3420.11 states that BOP employees are subject to administrative action, up to an including removal, for any inappropriate contact, sexual behavior, or relationship with inmates, regardless of whether such contact constitutes a

prosecutable crime. Physical contact is not required to subject an employee to sanctions for misconduct of a sexual nature.

40.     Program Statement 3420.11 also states that "Title 18, U.S. Code Chapter 109A provides penalties of up to life imprisonment for sexual abuse of inmates where force is used or threatened. Sexual contact is defined as the intentional touching of the genitalia, anus, groin, breast, inner thigh, or buttocks with the intent to abuse, humiliate, harass, degrade, arouse, or gratify the sexual desire of any person. All allegations of sexual abuse will be thoroughly investigated and, when appropriate, referred to authorities for prosecution."

41.     Each new BOP employee, contractor, and volunteer must receive and sign a form acknowledging receipt of Program Statement 3420.11.

42.     On November 10, 2014, Highsmith signed an acknowledgement that he received the updated version of Program Statement 3420.11.

43.     On information and belief, as BOP employees, Defendants Jones, Coil, Proffitt, Brown and Pulido, all similarly received and signed an acknowledgement of training for updated versions of Program Statement 3420.11.

44.     BOP Program Statement 5324.12 (Sexually Abusive Behavior Prevention and Intervention Program) concerning the prevention of, and intervention upon sexually abusive behavior, implements zero tolerance toward all forms of sexual activity, including sexual abuse and sexual harassment, and provides guidelines to address prohibited and/or illegal sexually abusive behavior.

45.     Program Statement 5324.12 is the controlling BOP policy addressing the prevention of, and intervention upon, sexually abusive behavior. It is disseminated

agency-wide and applies to all facilities operated by the BOP and every staff member working within each correctional facility.

46.     Program Statement 5324.12 lays out duties and responsibilities with respect to conduct for all BOP employees, and mandates particular staff and agency reporting duties with respect to sexually abusive behavior, including concerning incidents or possible incidents of sexual abuse or sexual harassment: it mandates that "[a]ll staff must report information concerning incidents or possible incidents of sexual abuse or sexual harassment to the Operations Lieutenant, or where appropriate, in accordance with the Program Statement 3420.11."

47.     BOP policy requires the training of all employees who may have contact with inmates on how to fulfill their responsibilities under agency sexual abuse and sexual harassment prevention, detection, reporting, and response policies and procedures.

48.     Between January 21 and 24, 2014, Highsmith completed annual refresher training during which time he signed a training acknowledgement that he had received and understood the BOP's sexual abuse prevention and intervention program training.

49.     Inmates, employees, and the public may file a complaint at the BOP facility where an incident of sexual abuse occurred; through BOP's Office of Internal Affairs; or with the Department of Justice Office of Inspector General (OIG). In accordance with the agency's own Standards of Employee Conduct, BOP employees must report any violation of those Standards, or any rule or law within one business day of the incident to their Chief Executive Officer (CEO), OIA, or the OIG. Decisions regarding disciplinary action in cases where the allegations are sustained are managed by BOP's Human Resources Management (HRM) and BOP's Office of General Counsel.

## **2014 Rape of T.D. by Highsmith**

50.     In 2014, the Office of Inspector General (OIG) received information from BOP Special Investigative Agent (SIA) Dan Clark alleging that on April 30, 2014, Highsmith sexually assaulted inmate T.D. inside the Officer's Station in C-Unit North of FCI Tallahassee.

51.     This report by SIA Dan Clark triggered a joint investigation between the OIG and the Federal Bureau of Investigation of the allegations involving Highsmith. OIG investigators interviewed six staff members, thirteen inmates (including the victim, T.D.), and Highsmith. OIG investigators reviewed surveillance video and medical records of the victim. Additionally, physical evidence, including articles of clothing belonging to the victim and a washcloth used by her, fabric from the desk chair in the officer's station used by Highsmith, swabs from the same desk chair, the telephone cord in the officer's station, as well as a tampon, and vaginal and cervical swabs were collected as part of the OIG investigation.

52.     OIG investigators also interviewed multiple Correctional Officers ("CO"s). Of the COs interviewed, none reported knowledge of Highsmith's alleged sexual assaults except for C.O. Alfred Brannan, who reported that when he arrived at work the morning of May 1, 2014 "[name redacted] told him that Highsmith had sexual intercourse with [T.D.]. [Name redacted] reported the incident to Counselor Manuel Pulido and Captain Roan McCullogh".

53.     The OIG determined that a preponderance of the evidence demonstrated that Highsmith likely sexually abused inmate T.D. and another unnamed victim who had since been released from BOP custody and was deported from the United States.

54.     BOP Program Statement 3420.11 (Official Investigation) requires that "…[d]uring the course of an official investigation, employees are to cooperate fully by providing all pertinent information they may have. Full cooperation requires truthfully responding to questions…"

55.     In its investigative report to Warden Jones, the OIG noted that Highsmith's denials of the incidents of sexual assault under investigation were not credible and constituted false statements to the OIG. The OIG found that Highsmith's denials of the allegations were not credible because, among other things, his denials were inconsistent with the testimony of eyewitnesses and with the OIG's review of video surveillance following the incident.

56.     The OIG concluded that by failing to provide truthful information during his interviews by OIG, Highsmith had further violated BOP Program Statement 3420.11 provisions concerning employee conduct during official investigations.

57.     The Chief of BOP's Office of Internal Affairs (OIA), forwarded the OIG's investigative report concerning the sexual assault of T.D. and a second unnamed inmate by Highsmith to Warden Jones. The cover letter to the OIG's report indicated that, "[b]ased on the OIG's findings," misconduct in the nature of an "Appearance of an Inappropriate Relationship" was "sustained" – requiring the Warden to "proceed with disciplinary or adverse action, and notify this [the Office of Internal Affairs] office of the action taken."

58.     The OIA's letter, and the OIG's investigative report on Highsmith were also forwarded to H.J. Marberry, who was at that time the Regional Director of BOP's Southeast Regional Office.

59.     Warden Jones was aware that the allegation of sexual assault against Officer Highsmith was substantiated by the joint investigation of the OIG and the FBI, but she did not seek to have Highsmith removed.

60.     Instead, Warden Jones decided that Highsmith's punishment should take the form of a 10 calendar-day suspension.

61.     Wardens Coil and Jones, as well as SIS Proffitt and Officer Pulido, were aware that Highsmith had raped an inmate, T.D., in 2014.

62.     Warden Jones was aware that the OIG and the FBI had uncovered substantial evidence that Highsmith had sexually assaulted T.D. in 2014 and that he lied to investigators about the sexual assaults when he was later questioned.

63.     Despite the clear evidence uncovered from these extensive investigations, Wardens Jones and Coil failed to take steps to prevent Highsmith from having unsupervised access to female inmates to whom he posed a clear risk of sexual abuse and sexual assault.

64.     Warden Coil failed to take appropriated steps to prevent Highsmith from having unsupervised access to female inmates to whom he posed a clear risk of sexual abuse and sexual assault.

65.     Officer Pulido was aware that the allegation of sexual assault against Highsmith was substantiated by the joint investigation of the OIG and the FBI and he and participated in the employee grievance process, acting on behalf of Highsmith.

66.     Officer Pulido was aware that Highsmith had a history of sexually abusing female inmates and was aware that Highsmith had raped inmate T.D. in 2014 and then lied to OIG investigators concerning the sexual assault.

67.     Officer Pulido failed to take appropriate steps to protect female inmates including J.P., from being assaulted by Highsmith, despite that fact that, Pulido, as J.P.'s correctional counsellor, would have been aware of the risk that Officer Highsmith posed to her and to all female inmates.

68.     On January 30, 2017, T.D. filed a complaint in federal court (Case No. 17-CV-00059) against defendants U.S.A. and Officer Highsmith, alleging, *inter alia* that she had been sexually assaulted by Highsmith.

69. On January 11, 2018 Warden Jones' deposition was taken in Case No. 17-CV-00059.

70.     On February 22, 2018, Case No. 17-CV-00059 was settled for a considerable monetary amount and subsequently dismissed on the same day.

## J.P. at FCI Tallahassee

71.     On September 13, 2016, J.P. weas sentenced and soon thereafter entered FCI Tallahassee to serve her custodial sentence.

72.     As part of J.P.'s admission to FCI Tallahassee, she was informed about the BOP's zero tolerance policy regarding sexual abuse of inmates and the reporting of sexual abuse; an Admission and Orientation Handbook; and a Prison Rape Elimination Act (PREA) pamphlet.

73.     These orientation materials explain that inmates have a right to be free from sexual abuse by anyone, including staff members, the lack of an inmate's ability to consent to sexual abuse by staff members, the means of reporting sexual abuse, and available resources to inmates facing sexual abuse.

74.     The standard Admissions and Orientation Handbook given to J.P. on her entry to FCI Tallahassee also further explained that, as an inmate, she could report

sexual abuse to staff members within the institution, including a case manager, Chaplain, psychologist, SIS, the Warden, "or any other staff member you trust".

75.     In the early months of 2018, Officer Highsmith began a campaign of sexualized harassment against J.P. This pattern of conduct began with Highsmith's paying an inordinate number of visits to her living area, paying extra attention to her, and unnecessarily getting physically close to her.

This pattern of sexual harassment escalated to incidents of sexual abuse against J.P.

76.     In May of 2018, while conducting his rounds inspecting D-Unit, Officer Highsmith demanded that J.P. expose her breasts and genitalia to him. J.P. refused to expose herself to Officer Highsmith. This incident – and the fact that Highsmith did this in an open housing area in view of other inmates - shocked J.P., and caused her to live in fear that she would suffer further sexual abuse or that she would eventually be sexually assaulted by Officer Highsmith.

77.     On information and belief, Highsmith had primary supervisory responsibility for the D-Unit – where J.P. was housed with dozens of other inmates - during his regular shifts.

78.     The D-Unit at FCI Tallahassee is an inmate living dormitory with an adjoining office referred to as the "guard's office". Each "guard's office" is used by the guard on shift with primary supervisory responsibility for the housing unit.

79.     On information and belief, Highsmith was the only officer directly supervising D-Unit during his scheduled shift, and the "guard's office" was Officer Highsmith's office, *de facto*, during those shifts when he was assigned to supervise D-Unit.

### J.P. is Sexually Assaulted by Officer Highsmith

80.     In June of 2018, in the days following the death of her brother, James[2], CO Highsmith approached J.P. to offer to escort her to the guard's office in D-Unit, where she could place a call to her mother concerning her brother's death.

81.     J.P. stood in the guard's office and place a short call to her mother. As J.P. hung up the phone, CO Highsmith told her "you know you have to pay for that call".

82.     CO Highsmith did not wait for a reply in response from J.P. as he walked toward her and demanded that she turn around and put her hands on the desk. CO Highsmith did not wait for J.P. to comply before he physically turned her away from him and pushed her toward the desk.

83.     CO Highsmith pulled down J.P.'s pants and raped her anally.

84.     This rape caused J.P. unspeakable physical pain, and it carried on for approximately five minutes.

85.     Officer Highsmith did not wear a condom and he ejaculated inside J.P.'s body.

86.     Having finished raping J.P. anally, CO Highsmith dismissed her, telling her to "wipe" and to "go on about [her] business".

87.     J.P. immediately experienced significant physical pain as a result of the sexual assault.

88.     J.P. attempted to keep the sexual assault to herself, and she immediately withdrew from her social contact with other inmates and withdrew from self-help programming.

---

[2] This is a pseudonym used to protect the identities of the plaintiff and her family.

89.     J.P. did not immediately report the rape because she feared retaliation by guards and other inmates. J.P. feared placement in the Segregated Housing Unit (SHU) as one possible immediate impact of reporting the rape, as she feared the isolation of being housed in what is a *de facto* condition of "solitary confinement".

90.     J.P. made a formal request to Officer West to be transferred out of Tallahassee to any another BOP facility, but could not bring herself to give the reason for her request.

91.     Officer West did not make further inquiries of J.P., and because her request was seemingly without basis, it was either not processed or constructively denied. Neither Mr. West nor any other staff member followed up on the reasons for her request for an immediate transfer from FCI Tallahassee.

92.     J.P. managed to keep the incident to herself until July 14, 2018, when Lt. King asked her how she was doing. J.P. broke down and told Lt. King that she had been raped by Officer Highsmith.

93.     Lt. King immediately encouraged J.P. to formally report that she had been raped by Officer Highsmith. J.P. initially refused to make this formal report, and told Lt. King that she feared Officer Highsmith and she feared retaliation by other guards, by inmates, and by administrative staff at FCI Tallahassee.

94.     J.P. reluctantly agreed to go to the Emergency Room with Lt. King and another guard, whose name she does not recall.

95.     J.P. was taken to Capital Region Health Center at approximately 9:00 p.m. on July 14th, 2018. She was examined in the emergency room and she was issued discharge instructions for sexual assault after-care and a prescription for the injuries to

her anus that resulted from being anally raped by Officer Highsmith. She was discharged at 10:58 p.m., the same night.

96.     This incident and Officer Highsmith's involvement in it was or should have been known to Warden Coil, who had a duty to safeguard not only J.P. but all female inmates – including J.P. - from further sexual assault by Officer Highsmith.

97.     BOP policy mandates that staff must report incidents of sexual abuse to the Operations Lieutenant, who is required to immediately safeguard the inmate.

98.     BOP policy also mandates that the Operations Lieutenant also ensures that the SIS, Chief of Correctional Services, Institution PREA Compliance Manager, and Warden are notified of any incident of sexual abuse.

99.     Upon his examination of inmate J.P. for injuries sustained during the rape by Officer Highsmith, Dr. Barr called FCI Tallahassee and demanded to speak to the Warden.

100.    On information and belief, Dr. Barr did not reach the Warden, but rather spoke with Lt. King.

101.    It is unknown what action Lt. King took on the basis of her conversation with Dr. Barr.

102.    J.P. was returned to FCI Tallahassee, but she was not immediately placed in the SHU for protective purposes or to protect the integrity of any investigation of Officer Highsmith, as is required by BOP Policy.

**Inmate and Staff Campaign of Retaliation Against J.P.**

103.    In the days after her return to FCI Tallahassee, J.P. confided to her friend, S.P., that she had been taken to the emergency room as a result of a sexual assault by Officer Highsmith.

18

104.    On information and belief, another inmate, K.L. overheard this conversation and in the following days and undertook to intimidate J.P.

105.    J.P. feared an imminent physical attack by inmate K.L.

106.    J.P. attempted to make a formal complaint to her correctional counsellor, Officer Brown, and related to him that she believed she was in danger of imminent attack by K.L. and explained that Officer Highsmith was involved in some way with K.L.'s sudden animosity toward her. J.P. had had no prior dealings with K.L.

107.    On information and belief, Officer Brown took no steps to further investigate this claim, and told J.P. that if K.L. attacked her, then "may the best woman win".

108.    J.P. was physically attacked the following day by K.L.

109.    J.P. was brought before a Disciplinary Hearing Officer in the aftermath of the attack for "fighting" with K.L.

110.    J.P. told the off-site DHO Officer, Officer Orr, who was presiding over the disciplinary hearing over a voice-over-internet protocol (internet-video phone call) that she had recently been sexually assaulted by Officer Highsmith and that she was not "fighting" with K.L. but rather had been physically attacked by K.L. J.P. also explained that she believed there was some connection between this attack and K.L.'s overhearing a discussion of the rape while the three inmates – J.P., S.P. and K.L. were in the shower area.

111.    On information and belief, Officer Orr took no steps to report this as a possible incident of retaliation relating to a formal report of a sexual assault, as is required by BOP Policy.

112.    Instead, Officer Orr dismissed this information and told J.P. to "take it up with someone at FCI Tallahassee".

113.    J.P. was placed in SHU for 20 days and lost 27 days good time that had accrued against her remaining sentence and she lost her place in the drug counselling program.

114.    In the months following J.P.'s rape and subsequent hospital visit, Officer Highsmith remained on duty at FCI Tallahassee, and he was not prevented from having access to female inmates pending the internal investigation of J.P.'s sexual assault.

115.    Neither Warden Coil, Officer Brown, Officer Pulido, nor Lt. Proffitt, or any SIS or SIA officer took steps to prevent Officer Highsmith from having access to J.P. while she was housed in SHU pending any investigation into the sexual assault by Officer Highsmith or any investigation into the retaliatory nature of the attack on J.P. by K.L.

116.    BOP facilities are mandated to monitor inmates for at least 90 days following a report of sexual abuse, and are required to "monitor the conduct and treatment of inmates or staff who reported the sexual abuse and of inmates who were reported to have suffered sexual abuse to see if there are changes that may suggest possible retaliation by inmates or staff, and shall act promptly to remedy any such retaliation. Items the agency should monitor include any inmate disciplinary reports, housing, or program changes…"

117.    Highsmith was assigned to guard J.P. in the SHU and, until he was later reassigned, he was a direct and observable presence to her while she was located there.

118.    On information and belief, J.P. was subsequently subjected to a campaign of retaliation by Tallahassee staff on her release from SHU, to include being placed in the SHU at various times for disciplinary infractions she did not commit.

119.    Retaliation against victims of sexual assault is an occurrence well known to BOP officials, and it is strictly prohibited by BOP Sexually Abusive Behavior Prevention and Intervention Program Statement 5324.12.

120.    On information and belief, around the time J.P.'s rape by Officer Highsmith, inmate S.P. confronted Officer Highsmith and was given a disciplinary write-up for openly and vocally accusing him of sexually abusive conduct toward her fellow inmates.

121.    On information and belief, S.P. was punished for this disciplinary infraction with a period of detention in the Segregated Housing Unit (SHU) that lasted for over a week, and she was not returned to D-Unit on her release from SHU.

122.    When J.P. learned that Officer Highsmith was still employed by the BOP and still worked at FCI Tallahassee even after her sexual assault, she filed a confidential administrative remedy request requesting to be transferred from that facility to "any other facility" and citing the Officer Highsmith's sexual assault as the reason for her request. This request was summarily denied and she appealed the request to Warden Coil, to Lt. Rivera, and to the Southeast Regional Office. BOP policy provides that inmates are encouraged to report allegations of sexually abusive behavior to staff at all levels, including local, regional and Central Offices.

123.    Following her request for transfer, J.P. was approached by Lt. Rivera, who is responsible for PREA compliance at FCI Tallahassee. On information and belief, Lt. Rivera told J.P. to "keep the rape to herself".

21

124.    J.P. was subsequently placed in SHU detention without a disciplinary hearing. It was explained to her by Lt. Rivera that she was being detained in SHU "pending an SIS investigation".

125.    On October 17, 2018, J.P. was released from SHU.

## COUNT I
## Eighth Amendment: Sexual Abuse, Battery, Sexual Harassment
## (Officer Highsmith)

126.    J.P. re-alleges and incorporates by reference all of the preceding allegations set forth herein.

127.    As an inmate in the custody of the BOP, J.P. had a clearly established right under the Eighth Amendment to the United States Constitution not to be subjected to cruel and unusual punishment while incarcerated.

128.    Sexual abuse by a guard is not a legitimate form of punishment, it is not an ancillary component of any prison sentence, and it serves no legitimate penal purpose.

129.    Highsmith violated J.P.'s rights by assaulting her, using coercion to have sexual contact with her for his gratification, and sexually abusing her while she was incarcerated at FCI Tallahassee.

130.    Highsmith, individually, failed in his duty to provide J.P. with constitutionally safe and secure conditions of confinement by subjecting her to sexual abuse, sexual assault, and battery.

131.    Highsmith acted intentionally, maliciously, and/or in reckless disregard of Plaintiff's statutory and common law rights, by sexually assaulting and raping her while she was incarcerated at FCI Tallahassee, despite knowing that severe emotional distress was certain to occur.

132.    As a direct and proximate result of Highsmith's sexual abuse and associated misconduct, J.P. was intentionally subjected to physical and emotional injury, depression, post-traumatic stress, embarrassment, and other damages, all or some of which shall continue indefinitely or permanently, as well as retaliation.

133.    The conduct of Highsmith which proximately caused J.P.'s injuries was of such a quality and nature as to warrant Highsmith's liability for punitive damages, in accordance with applicable law.

134.    J.P. is entitled to recover from Highsmith all of her damages recognized by applicable law.

135.    All of Highsmith's acts and omissions were taken while acting under color of law and in the scope and course of his position as a senior Corrections Officer at FCI Tallahassee.

**COUNT II**
**Eighth Amendment: Failure to Intervene, Deliberate Indifference**
**(Defendants Jones, Coil, Proffitt, Brown and Pulido)**

136.    J.P. re-alleges and incorporates by reference all of the preceding allegations set forth herein.

137.    Defendants Warden Jones, Warden Coil, SIS Officer Proffitt, Officer Brown, and Officer Pulido (collectively referred to as "correctional defendants") each owed a duty to J.P. while she was incarcerated at FCI Tallahassee to protect her by ensuring that she served her sentence of imprisonment in a facility that is "safe, humane, cost efficient and appropriately secure."

138.    Warden Jones knew that Highsmith had sexually assaulted T.D. at FCI Tallahassee in 2014 in contravention of the BOP's Sexually Abusive Behavior Prevention and Intervention policy.

139.    Warden Jones was also aware that Highsmith had provided false statements to OIG and FBI investigators in contravention of the Standards of Conduct.

140.    The Correctional Defendants breached their duties to J.P. by providing and/or permitting Highsmith unrestricted and unsupervised one-on-one access to J.P. while she was incarcerated at FCI Tallahassee despite knowledge of Highsmith's past and continuing sexual abuse and harassment of female inmates.

141.    Warden Jones was aware that the OIG had investigated the rape of T.D. and found that the evidence of that conduct warranted, a referral of the case to the United States Attorney for criminal prosecution.

142.    Warden Jones failed to appropriately discipline Highsmith for his sexual assault of inmate T.D.

143.    Warden Jones failed to ensure that the Regional Director and the Office of Internal Affairs were notified of the allegation involving Highsmith's sexual assault of T.D.

144.    The Office of the Regional Director had information concerning the allegations of Highsmith's sexually abusive conduct toward inmates when S.P. filed her administrative remedy request identifying Highsmith as an ongoing threat to the safety and security of the inmates at FCI Tallahassee.

145.    Despite such knowledge, none of the Correctional Defendants prevented Highsmith from accessing female inmates, and he used that access to isolate at least two inmates in 2018 in the guard's office, where he raped them.

24

146.    Warden Coil was or should have been apprised of the incident involving J.P. in June of 2018.

147.    Warden Coil also had access to Highsmith's personnel file and other information from other sources revealing Highsmith's history of and proclivity toward committing sexual assaults against female inmates, including his sexual assault of T.D. in 2014.

148.    Officer Pulido as J.P.'s correctional counsellor was aware, and the other Correctional Defendants either were aware or should have been aware, that J.P. had been brought to the hospital after having been sexually assaulted by Officer Highsmith, and were aware that she had been housed in SHU subsequent to and as a result of the sexual assault, supposedly so as to separate her from Officer Highsmith; however, despite having knowledge that Officer Highsmith had access to J.P. at SHU, defendants did not prevent him from being assigned to the SHU.

149.    Each of the Correctional Defendants was deliberately indifferent to the risk faced by J.P. relative to Officer Highsmith because each failed to take reasonable steps to address the danger that he posed to J.P. and to all inmates.

150.    In the face of this known risk to Plaintiff's safety, the deliberate indifference of the Correctional Defendants, who were responsible for the custody, care, safety, and "correctional treatment" of J.P., was a direct and proximate cause of the violation of J.P.'s rights under the United States Constitution and Plaintiff's resulting damages.

151.    The acts, omissions, policies, and practices of Wardens Jones and Coil and Officers Proffitt, Brown, and Pulido constituted a knowing violation of J.P.'s clearly established constitutional rights.

152.   J.P.'s constitutional right not to be sexually abused or assaulted in prison was firmly established before the BOP rules establishing PREA-compliant mandatory procedures for handling sexual abuse cases went into effect on June 24, 2015.

153.   Wardens  Jones and Coil and Officers Proffitt,  Brown, and Pulido, failed in their respective duties to provide J.P. with constitutionally safe and secure conditions of confinement by and through their deliberate indifference to the substantial, longstanding, and obvious risk posed by Highsmith.

154.   The policies, practices, acts, and omissions of Wardens  Jones and Coil and Officers Proffitt,  Brown, and Pulido, directly and proximately caused the violation of J.P.'s Eighth Amendment right to be free from sexual abuse and sexual battery while incarcerated and Plaintiff's resulting damages.

155.   Wardens  Jones and Coil and Officers Proffitt,  Brown, and Pulido directly and proximately caused the violation of J.P.'s rights under the Eighth Amendment of the United States Constitution by, as one example, failing to train, supervise, and discipline FCI Tallahassee staff and employees and/or report known or suspected sexual misconduct, thereby failing to adequately prevent further constitutional violations.

156.   Wardens  Jones and Coil and Officers Proffitt,  Brown, and Pulido directly and proximately caused the violation of J.P.'s rights under the Eighth Amendment of the United States Constitution by failing to adhere to and /or ensure that FCI Tallahassee staff followed PREA-mandated policy for responding to suspected or known instances of sexual abuse at the institution, thereby failing to adequately prevent further constitutional violations.

157.   Wardens Jones and Coil directly and proximately caused the violation of J.P.'s rights under the Eighth Amendment of the United States Constitution by failing to

ensure the coordination of departments within the facility in preventing, detecting, intervening, and appropriately responding to sexually abusive behavior.

158.    Wardens Jones and Coil, and SIS Proffitt directly and proximately caused the violation of J.P.'s rights under the Eighth Amendment of the United States Constitution by consistently failing to establish and enforce procedures for investigating and reporting disciplinary infractions so as to limit opportunities for FCI Tallahassee staff to be alone with inmates  unsupervised, providing the opportunity for them to have sexual contact with or to sexually assault or rape persons in the custody of the BOP at FCI Tallahassee.

159.    Officers Brown and Pulido directly and proximately caused the violation of J.P.'s rights under the Eighth Amendment of the United States Constitution by failing to make such further inquiries or interventions as would be reasonable given their knowledge that Highsmith had been alone for an unknown period of time, unsupervised and unobserved, in an office with an inmate, particularly when knowing of Highsmith's sexual proclivities and past conduct respecting inmates.

160.    By their acts and omissions, Wardens Jones and Coil, and Officers Brown, Pulido, and SIS Proffitt placed J.P. in substantial risk of sexual abuse and took no action to protect J.P. from further sexual abuse by Officer Highsmith when they failed to *formally* report or make such further inquiries as would be reasonable given their duty to act immediately in mitigating such risk.

161.    Wardens Jones and Coil, SIS Proffitt, and Officers Brown and Pulido, engaged in a direct violation of J.P.'s constitutional rights by failing to take appropriate measures to protect J.P. and all inmates at FCI Tallahassee in the face of their actual or

constructive knowledge of the risk posed by Officer Highsmith, thereby subjecting the plaintiff and entire inmate population to substantial risk of imminent sexual abuse.

162.    The Correctional Defendants breached their duties to J.P. under PREA as follows:

- Section 115.11 – failing to enforce zero tolerance policy

- Section 115.13 – failing to supervise and monitor (video surveillance) one-on-one inmate/officer contact

- Section 115.15 – permitting improper cross-gender pat downs

- Section 115.17 – hiring, promoting and retaining officers who "may" have had improper sexual contact

- Section 115.43 – punishing sex victims with involuntary segregated housing, loss of privileges and work permits

- Section 115.61 – failing to report suspicion of sexual abuse

- Section 115.67 – failing to protect inmates from retaliation after reporting abuse

- Section 115.76 – failing to discipline staff for sexual misconduct.

As a direct and proximate result of each correctional defendant's misconduct, J.P. was intentionally subjected to physical and emotional injury, depression, post-traumatic stress, embarrassment, and other damages, all or some of which shall continue indefinitely or permanently, as well as retaliation.

163.    The conduct of each of the correctional defendants which proximately caused J.P.'s injuries was of such a quality and nature as to warrant punitive damages against him/her, in accordance with applicable law.

164.    J.P. is entitled to recover from the Correctional Defendants all of her damages recognized by applicable law.

165. All of the conduct of the respective Correctional Defendants upon which this action is based while each defendant was acting under color of law and in the scope and course of his or her position as a BOP employee and/or agent and/or representative at FCI Tallahassee.

**COUNT III**
**Federal Tort Claims Act: NEGLIGENCE**
**(United States of America)**

166. J.P. re-alleges and incorporates by reference all of the preceding allegations set forth herein.

167. Defendant the United States of America is responsible for the oversight of its employees, which includes officers and staff at federal correctional institutions, including United States Federal Correctional Institution Tallahassee.

168. Pursuant to the Federal Tort Claims Act, the United States is liable for damages caused by the negligent or wrongful acts of its employees acting within the scope of their employment, under circumstances where the United States, if a private person, would be liable in accordance with the laws of the State of Florida.

169. Federal law specifically requires the BOP to "provide for the safekeeping, care, and subsistence of all persons charged with or convicted of offenses against the United States" and to "provide for the protection ... of all persons charged with or convicted of offenses against the United States." 18 U.S.C. § 4042(a)(2)-(3).

170. Defendant United States and the supervisors and employees of FCI Tallahassee have a duty to provide inmates with a safe and secure environment, free of dangers, including the dangers of sexual harassment and sexual assault.

171. As a premises owner/operator, the United States has a duty to provide inmates with a reasonably safe place, which specifically includes a place reasonably free

and safe from known sexual abusers and rapists and/or individuals who pose a foreseeable risk of sexual abuse or rape.

172.     Correctional officers and other prison officials at FCI Tallahassee have a duty to protect inmates from harm caused by correctional officers and other prison officials.

173.     Correctional officers and other prison officials at FCI Tallahassee have a duty to house inmates in a safe and secure manner.

174.     Correctional officers and other prison officials at FCI Tallahassee have a duty to protect inmates from known and obvious dangers posed by correctional officers and other prison officials.

175.     Correctional officers and other prison officials at FCI Tallahassee have a non-discretionary duty, pursuant to PREA, to enforce a policy of "zero-tolerance" with respect to sexual abuse of inmates by staff.

176.     Pursuant to 28 C.F.R. § 115.17(f), FCI Tallahassee and Warden Jones and Warden Coil both had a non-discretionary duty to ask Officer Highsmith in interviews and written self-evaluations conducted as part of his performance reviews about all incidents of alleged sexual abuse by Highsmith, including but not limited to the incident described by T.D. in 2014. Upon information and belief, FCI Tallahassee and Wardens Jones and Coil breached this non-discretionary duty.

177.     Pursuant to 28 C.F.R. § 115.31, BOP and FCI Tallahassee had a non-discretionary duty to train employees on how to prevent sexual abuse and sexual harassment, the right of inmates to be free from sexual abuse and harassment, the dynamics of sexual abuse and harassment, the common reactions of sexual abuse and harassment victims, and how to detect and respond to signs of threatened and actual

sexual abuse and to ensure that such training was properly followed. BOP and FCI Tallahassee breached this duty and such breach was a proximate cause of the injuries and damages alleged herein.

178. Pursuant to 28 C.F.R. §§ 115.31 and 115.33, BOP and FCI Tallahassee had a non-discretionary duty to train employees and advise inmates of their right to be free from retaliation for reporting incidents of sexual harassment and sexual abuse by corrections officers and to ensure that such training was properly followed. BOP and FCI Tallahassee breached this duty and such breach was a proximate cause of the injuries and damages alleged herein.

179. Pursuant to 28 C.F.R. § 115.17, BOP and FCI Tallahassee officials have non-discretionary duties with respect to the hiring, promotion, and periodic review of their employees. Those non-discretionary duties include duties to consider, with respect to hiring and promotion decisions, any incidents of sexual harassment, whether the employee has engaged in sexual abuse, and whether the employee has been convicted or civilly adjudicated of sexual abuse. Upon information and belief, with respect to Defendants who facilitated continued employment and the transfer and promotion of Highsmith, BOP and FCI Tallahassee officials failed to perform their non-discretionary duties.

180. BOP supervisory officials have a duty to monitor, supervise, train, and discipline correctional staff at FCI Tallahassee in order to ensure that correctional staff properly perform their PREA-mandated duties so that inmates' Eighth Amendment rights are not violated.

181. Corrections officers and supervisors have a non-discretionary duty to report suspicion of sexual abuse by corrections officers and supervisors have a non-

discretionary duty to investigate such reports and to take action with respect to substantiated reports.

182.    Correctional officers at FCI Tallahassee knew that Highsmith posed an excessive and unreasonable risk to the health and safety of J.P. and that he had been sexually abusing inmates at FCI Tallahassee for years, including one instance involving the rape of T.D. One of the following had to have occurred: (1) the correctional officers, as alleged above, breached their non-discretionary duty to report their direct knowledge or belief of Highsmith's sexual misconduct; (2) the supervisors failed in their non-discretionary duties to investigate and take action with respect to Highsmith specific misconduct; or (3) corrections officers and supervisors either deliberately ignored or were carelessly inattentive with respect to the signs all around them.

183.    Prison officials at FCI Tallahassee knew or should have known that Highsmith should not have been permitted to have unsupervised access to inmates, including J.P., to whom he posed an excessive and unreasonable risk.

184.    Prison officials at FCI Tallahassee knew or should have known that Highsmith should have been terminated or permanently kept away from all inmates subsequent to the incident with T.D. Instead, they allowed Officer Highsmith to retain his unrestricted and unsupervised access to the population of female inmates, to include Plaintiff J.P.

185.    As a direct result of the prison officials' breaches of their non-discretionary duties or their reckless, willful, wanton and careless disregard of the obvious and known risk to inmates in improperly performing them, J.P. suffered personal injuries associated with and arising from sexual abuse and sexual assault at the hands of Highsmith.

186.    As a result of the acts and omissions upon which Plaintiff's claims against Defendant United States of America are grounded, Plaintiff suffered severe physical and emotional injury, depression, post-traumatic stress, embarrassment, and other damages, all or some of which shall continue indefinitely or permanently, as well as retaliation.

187.    J.P. is entitled to recover from Defendant United States of America all of her damages recognized by applicable law.

## COUNT IV
### Federal Tort Claims Act: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### (United States of America)

189.    J.P. re-alleges and incorporates by reference all of the preceding allegations set forth herein.

190.    Highsmith, acting within the course and scope of his employment with the BOP as investigative or law enforcement officials, engaged in the intentional infliction of emotional distress of J.P., through unwanted, non-consensual sexual abuse, sexual assault, and harassment as defined in section 115.6 of PREA.

191.    Highsmith's conduct as described herein was (1) intentional and reckless with knowledge that emotional distress would likely result, (2) outrageous and went beyond all bounds of decency to be tolerated in a civilized community, (3) the direct and proximate cause of the emotional distress endured by Plaintiffs, and (4) severe and damaging.

192.    As a direct and proximate cause of the intentional infliction of emotional distress specified herein, Highsmith caused damage to J.P. including psychological trauma, emotional distress, depression, physical trauma and pain and suffering.

193.    J.P. is entitled to damages from the United States of America under the Federal Tort Claims Act for the intentional infliction of emotional distress committed by Highsmith in an amount to be determined at trial.

**COUNT V**
**NEGLIGENCE**
**(Nakamoto Group, Inc.)**

194.    J.P. re-alleges and incorporates by reference all of the preceding allegations set forth herein.

195.    As mandated by PREA, the BOP conducts PREA audits at each federal prison facility once every three years. At all times relevant to this complaint, PREA audits for all BOP facilities were conducted by Nakamoto.

196.    The primary purpose of the onsite phase of the PREA audit inspection is to assess the day-to-day practices used by facility staff to promote sexual safety and to prevent rape in prison.  During the onsite phase of a PREA audit, auditors are supposed to conduct a thorough examination of the entire facility, observe routine activities, interview staff and inmates, and review and retain key documents maintained by the facility.

197.    During the "onsite review" component of an audit, PREA compliance auditors are required to spend a number of days (usually three) at the facility conducting a site inspection and conducting interviews with both executive and rank-and-file staff and inmates randomly selected by the auditor during the site visit, or inmates previously identified by the facility as being fairly representative of a number of inmate social categories, such as: youthful inmates, inmates with limited English language proficiency and transgender inmates.  Finally, PREA audits are supposed to

involve a careful process of documentation selection and review. These core components form the foundation of a practice-based audit methodology.

198.    Nakamoto contractors conducted audits of FCI Tallahassee in June of 2015 and in March of 2018.

199.    The PREA audits conducted by Nakamoto were materially incomplete, as auditors failed to properly conduct required systematic reviews of documents held by FCI Tallahassee related to sexual abuse and sexual harassment allegations over the prior 12 months at the facility; failed to properly interview inmates and/or staff that were involved in or witness to PREA violations by Highsmith or any other guard.

200.    Prior to going onsite to a facility, Nakamoto failed to conduct a broad internet search on the audited facility in advance of the audit to determine if there was any relevant information that might have shed light on the culture and history of the facility such as recent budgetary or staffing changes, legal action against the facility, press clippings, and other information that might inform the audit or if Nakamoto did conduct such a search it ignored the readily available information regarding longstanding and ongoing sexual misconduct at FCI Tallahassee.

201.    PREA Standard 115.401(h) states, that all auditors "[shall] have access to, and shall observe, all areas of the audited facilities." In order to meet the requirements in this Standard, the site review portion of the onsite audit must include a thorough examination of the entire facility.

202.    Nakamoto was required to be critically engaged with critical facility functions including but not limited to intake and risk screening; activity in the housing units; bathroom and shower procedures; staffing ratios; cameras and surveillance

technology deployment and use; access to reporting entities; and supervision practices at FCI Tallahassee.

203.   Nakamoto consistently failed to conduct thorough examinations of critical facility functions FCI Tallahassee.

204.   Nakamoto was required to review internal records at FCI Tallahassee as part of the auditing process, including but not limited to background check records; supervisory rounds logs; risk screening and intake processing records; medical files; and investigative files—including a review of a representative sample of each type of record.

205.   Nakamoto failed to review appropriate records and/or failed to note discrepancies, irregularities or problems that should have been readily apparent from the well-known activities of Highsmith and/or other staff at FCI Tallahassee.

206.   Nakamoto failed to use reasonable care and diligence to hire, train, and supervise its auditor staff to obtain sufficient facts to support all statements, conclusions, and findings of the audits performed at FCI Tallahassee.

207.   The negligent and/or improper performance of  inspections by Nakamoto of FCI Tallahassee by failed to identify and address obvious signs of endemic sexual abuse at the facility and was a proximate cause of the injuries and damages suffered by J.P. and other female inmates at FCI Tallahassee.

208. As a direct and proximate result of Nakamoto's negligence and misconduct, J.P. was intentionally subjected to physical and emotional injury, depression, post-traumatic stress, embarrassment, and other damages, all or some of which shall continue indefinitely or permanently, as well as retaliation.

**COUNT VI**
**BREACH OF CONTRACT**
**(Nakamoto Group, Inc.)**

209.    J.P. re-alleges and incorporates by reference all for the preceding allegations set forth herein.

210.    Nakamoto Group, Inc. (Nakamoto) operates as an SBA 8(a) Program minority business which, because of such status, receives certain preferential benefits in applying for and receiving bids on Federal government contacts.

211.    After having received federal contracts in unrelated areas of government work, Nakamoto entered into various contracts with the United States to perform audits of detention facilities (e.g., ICE facilities on the U.S. border) and to perform Prison Rape Elimination Act (PREA) audits of Bureau of Prisons correctional facilities.

212.    As a part of the aforementioned contracting process, Nakamoto had a contract to perform PREA audits at FCI Tallahassee.

213.    Upon information and belief, the contract regarding PREA audits for BOP correctional facilities, including FCI Tallahassee, have paid Nakamoto by way of consideration large sums of money measured in the millions of dollars.

214.    The purpose of the Prison Rape Elimination Act (PREA) auditing function, which the contract with Nakamoto was to provide for the BOP, was to insure compliance with the mandates of the Prison Rape Elimination Act (PREA) 34 U.S. Code § 30301.

215.    The purpose of the act is to "provide for the analysis of the incidence and effect of prison rape in Federal, State, and local institutions and to provide information, resources, recommendations and funding to protect individuals from prison rape."

216.    J.P. at all times relevant to the allegations herein was and she remains a federal inmate and thus an individual to be protected "from prison rape."

217.    J.P. is an individual for whom the PREA auditing function was designed to protect.

218.    The intent and/or purpose of the contract between Nakamoto and the BOP either as expressed by the parties, or in the provisions of the contract, was that the contract primarily and directly was to benefit inmates such as J.P.

219.    Nakamoto breached the contract by failing to conduct appropriate and meaningful PREA audits and to make appropriate and meaningful reports which would have provided the BOP with the necessary information to take corrective action to not only fulfill the purpose of PREA "to protect individuals from prison rape" but to also help fulfill their mandated duty to  "provide for the safekeeping, care, ... of all persons charged with or convicted of offenses against the united states" and to "provide for the protection ... Of all persons charged with or convicted of offenses against the united states." Under 18 U.S.C. § 4042(a)(2)-(3).

220.    As a direct and proximate result of Nakamoto's the breach of the contract between Nakamoto and the BOP, J.P. was injured and damaged as alleged above.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff requests that this Honorable Court grant her the following relief:

1.      Compensatory damages as to all Counts;

2.      Punitive damages as to all counts excepting Counts III and IV against the United States of America under the FTCA;

3.      Reasonable attorneys' fees and costs in accordance with applicable law; and,

4.      Such other further relief as this Court deems just.

Plaintiff hereby demands a jury trial on all Counts so triable under applicable law.

**J.P.,** Plaintiff

*/s/Ryan J. Andrews*
Ryan J. Andrews, Esq. (FBN 104703)
Andrews Law Firm
822 N Monroe St
Tallahassee, FL 32303
P: (850) 681-6416
ryan@andrewslaw.com
service@andrewslaw.com

*/s/Jay T. McCamic*
Jay T. McCamic, Esq. (WVSB# 2386)
McCamic Law Firm, PLLC
80 12th Street, Ste. 305
P.O. Box 151
Wheeling, WV 26003
Telephone: 304-238-9460
Fax: 304-830-5324
jay@mccamic.com

*s/L. Dante diTrapano*
L. Danté diTrapano, Esq. (WVSB# 6778)
Calwell Luce diTrapano, PLLC
500 Randolph Street
Charleston, WV 25302
Telephone: 304-343-4323
Fax: 304-344-3684
dditrapano@cldlaw.com
Benjamin Adams, Esq. (WSB# 11454)
badams@cldlaw.com
Alex McLaughlin, Esq. (WVSB# 9696)
amclaughlin@cldlaw.com

*s/Anthony I. Werner*
Anthony I. Werner, Esq. (WVSB# 5203)
John & Werner Law Offices, PLLC
Board of Trade Building, STE 200
80 - 12th Street
Wheeling, WV 26003
Telephone: 304-233-4380
Fax: 304-233-4387
awerner@johnwernerlaw.com